GREAT AMERICAN INDEMNITY COMPANY, Plaintiff,

v.

Olin Lewis BEVERLY, Defendant.

Civ. A. No. 440.

United States District Court
M. D. Georgia,
Thomasville Division.

Dec. 13, 1956.

BOOTLE, District Judge.

A corporate surety, Great American Indemnity Company, sues Olin Lewis Beverly, its principal, on an indemnity agreement contained in the written application executed by the principal for a public official's bond and seeks to recover loss and expenses it claims to have sustained and incurred in consequence of the bond.

The plaintiff claims three items; namely, $3,000 it paid out in settlement of a suit upon the bond, $504.63, its attorneys fees in connection with the defending and settling of said suit and $1,168.21, its attorneys fees for the prosecution of this action. The defendant denies any and all indebtedness and counterclaims $1,168.21 as his attorneys fees for defending this action. The plaintiff then filed its motion to dismiss defendant's cross-action.

With the pleadings thus perfected, the parties, through their counsel, entered into a written stipulation of the facts agreeing that the statement of facts contained in the stipulation and the exhibits annexed thereto are true and correct and contain all of the evidence material to a fair trial of the cause. Then, following the stipulation of facts and exhibits, each party filed a written motion for a judgment in its favor for the sums claimed in such party's pleadings.

The Court finds the facts to be as stipulated. The stipulation covers six pages, plus a total of eighteen exhibits, many of which themselves contain a number of pages. Therefore, in the interest of brevity, the Court will not re-state herein the facts as so stipulated and as hereby found to be true, but will summarize them in brief outline, as follows:

On or about February 11, 1949 the defendant, who had been regularly elected as sheriff of Colquitt County, Georgia, executed and delivered to plaintiff an application for a public official's bond, which application contains an agreement by the defendant "to indemnify the Company against any losses,

Whelchel & Whelchel, Moultrie, Ga., for plaintiff.

Peter W. Walton, Moultrie, Ga., A. J. Whitehurst, Thomasville, Ga., for defendant.

damages, costs, charges, and expenses it may sustain, incur, or become liable for in consequence of the said Bond." In accordance with said application, the plaintiff issued its bond No. 430702 in the penal sum of $10,000, effective January 1, 1949 and ending December 31, 1952, conditioned that the "principal shall faithfully perform such duties as may be imposed on him by law and shall honestly account for all money that may come into his hands in his official capacity during the said term." The bond itself is dated "this 1st day of January, 1949." The stipulation is silent as to whether the dates borne by the application and by the bond are the true and correct dates of their execution. Exhibit 14, however, attached to the stipulation, is a copy of the suit which Walter Applewhite filed against the plaintiff on said bond and exhibited to said suit is a typewritten copy of said bond showing at the foot thereof "Approved: T. Josh Davis, Ordinary, Filed in Office January 1, 1949. Recorded January 7, 1949." Defendant contends, therefore, that the application followed rather than preceded the execution of the bond and is therefore a nudum pactum. As the Court sees it, however, it is immaterial whether the application preceded by a few days or followed by a few days the issuance of the bond. These two writings were obviously intended as, and constituted a part of, the same transaction and must be construed together. 12 Am.Jur. 781, 782 (Contracts, Sec. 246); Peerless Casualty Co. v. Housing Authority of Hazelhurst, Georgia, 5 Cir., 228 F.2d 376. Moreover, the defendant, in his answer in the third defense, admits those allegations of paragraph 2 of plaintiff's petition that "defendant on or about February 11, 1949, executed and delivered to the plaintiff an application for a public official's bond * * * that the plaintiff *thereupon* issued its bond No. 430702 in the penal sum of $10,000.-00 effective January 1, 1949, * * *" (emphasis supplied). And in his answer in the second defense defendant further states: "Defendant admits * * *

that he made application to plaintiff for the plaintiff to become surety on his public official's bond, but shows that the bond so executed by plaintiff as defendant's surety *in consequence of said application,* and the usual fee * * *." (Emphasis supplied.)

On April 3, 1953, a suit for $10,000 was filed by said Walter Applewhite against the plaintiff on the defendant's bond in the Superior Court of Fulton County, Georgia. An independent investigation was made by plaintiff through their local counsel in Colquitt County, Georgia and the plaintiff retained counsel in Atlanta to defend the suit. The Atlanta counsel had the benefit of said investigation and, after filing defensive pleadings, recommended and negotiated a settlement. No notice was given by plaintiff to defendant of the pendency of said suit and no investigation of the facts was made from, or through, the defendant. The defendant had no opportunity to defend the action or to enter into the negotiations for settlement. The plaintiff consummated said settlement by paying to Applewhite $3,000 and to their counsel for services in the Applewhite case $504.63. Said sums were then demanded of defendant by plaintiff and payment refused. This suit then resulted and plaintiff is obligated to pay $1,168.21 to its attorneys for prosecution of the same. The defendant is obligated to pay his attorneys a like sum for the defense of this action.

The facts giving rise to the Applewhite suit are briefly summarized as follows:

There was issued in Hamilton County, Tennessee, on August 10, 1950, a warrant for Applewhite's arrest. It is based upon an affidavit charging embezzlement of a 1950 Ford business coupe automobile, property of A. N. Levin. The warrant is captioned "State of Tennessee, Hamilton County" and is directed "To any lawful officer of said County." On August 11, 1950, Trooper Ed Vann of the Georgia State Patrol, was advised by radio from Georgia State

Patrol Headquarters, while patrolling on duty in Colquitt County, Georgia in a State Patrol radio-equipped car, to pick up and hold Applewhite on a charge of automobile theft for the benefit of the Tennessee Highway Patrol and on said date Vann did arrest Applewhite and turned him over to a deputy of the defendant for safeholding in the jail of Colquitt County, Georgia. On August 14, 1950, the Tennessee Highway Patrol telegraphed the defendant "Hold Walter Applewhite extradition papers will begin this date". On August 19, 1950, the Tennessee Highway Patrol telegraphed defendant "Tennessee Governor will sign extradition papers Tuesday Governor Talmadge will have papers by Thursday warrant mailed air mail special." The warrant referred to was the warrant above described which had been issued in Tennessee on August 10, 1950. On August 19, 1950, Applewhite caused to be served upon defendant a habeas corpus proceeding alleging, among other things, that Applewhite was being illegally restrained of his liberty by the defendant; that the cause or pretense of said restraint was under and by virture of an alleged Tennessee warrant; that Applewhite had requested that he be shown the warrant under which he was being held and that the request had been refused; that he had been held in jail since August 11, 1950 and had requested that he be allowed to give bail, which request had been refused. On August 31, 1950, the habeas corpus petition was amended so as to allege that inasmuch as Applewhite had been retained in jail since August 11th, he was being held in violation of Georgia Code, § 44–304. The habeas corpus petition was heard by Honorable Robert H. Cranford, Judge, City Court, Colquitt County, Georgia on August 31, 1950 and Applewhite was ordered released by Court order reading as follows:

"The within matter coming on for a hearing on the date set in the same, and after hearing the evidence therein, it appearing to the court that the sheriff is without the necessary warrant from the Governor of Georgia to hold the defendant, and it appearing that no effort has been made to obtain such warrant, and the time allowed by law having expired, it is considered, ordered and adjudged by the Court that the defendant herein be discharged immediately by the Sheriff of Colquitt County."

On February 28, 1951, defendant personally arrested Applewhite by virtue of a pluries capias issued from the Court of General Sessions of Hamilton County, Tennessee. On March 12, 1951, Applewhite filed another habeas corpus proceeding against the defendant alleging that he was being illegally restrained under said capias, from which it appeared that an indictment had been found against him in Tennessee charging embezzlement and fraudulent breach of trust on August 1, 1950, and that he had not been in the State of Tennessee between July 22, 1950 and March 1, 1951. The defendant filed his response on March 15, 1951, alleging that the detention was by virtue of said capias and in default of bond in the sum of $2,500. Said habeas corpus petition was amended on March 15, 1951, so as to allege that Applewhite's detention from February 28, 1951 until March 15, 1951 (14 days) was for an unreasonable length of time under said capias, there being no warrant from the Governor of Georgia in the hands of the Sheriff. On March 15, 1951, the same Judge of the same Court again released Applewhite by order, as follows:

"The within and foregoing case coming on regularly to be heard and it appearing that the said Walter Apple (sic) has been held beyond a reasonable time and that the Sheriff failing to show a governor's warrant, the said O. L. Beverly is ordered to release the petitioner."

On March 5, 1951, the Governor of the State of Tennessee requested the Governor of Georgia to deliver Applewhite as a fugitive from justice and, on March 12, 1951, the Governor of Georgia issued his executive warrant for Applewhite's arrest as a fugitive from justice and ordered that he be delivered

up to an agent of the State of Tennessee. Accordingly, on March 14, 1951, the defendant again arrested Applewhite, under the Governor's warrant and, on March 20, 1951, Applewhite caused defendant to be served with another habeas corpus proceeding alleging, in substance, that inasmuch as Applewhite had not been in the State of Tennessee at any time, either bodily, corporally or constructively from July 22, 1950 it was impossible for him to have committed the alleged crime on August 1, 1950, or at any other time and that he could not be a fugitive from justice from the State of Tennessee. The defendant's response showed that Applewhite had been arrested by defendant under said Governor's warrant and had been admitted to bail. Said habeas corpus proceeding was heard on March 23, 1951 and Applewhite was again released by said Court under order reading:

"The above matter coming on for hearing and it appearing to the court by uncontradicted evidence that the said Walter Applewhite was not in the State of Tennessee at the time that the transaction which is alleged to have constituted the crime with which he is charged took place, that he has not been in the state of Tennessee at any time since. It is the judgment of this court that the said Walter Applewhite is not a fugitive from the justice of the state of Tennessee, and it is hereby ordered that said Walter Applewhite be released this March 23, 1951."

Defendant at all times above mentioned acted without any apparent malice in connection with the incarceration of Walter Applewhite and acted according to his best judgment and upon advice of counsel, and did what he deemed was his duty in these matters.

■ Clearly, the defendant's cross-action seeking to recover in this action his attorneys fees for defending this action cannot be maintained. The Supreme Court of Georgia answered this question in the case of Fender v. Ramsey & Phillips, 131 Ga. 440(2), 62 S.E. 527, 528, in the following language:

"The constitutional right to appeal to the courts (Civ.Code 1895, § 5701) authorizes a fair and legitimate testing of one's bona fide claim of right. A litigant is not subject to be penalized by the award of damages whenever he loses his case. Otherwise, every man would enter the doors of the courthouse, no matter how honestly or with what probable cause, with the danger of damages hanging over him. The Civ. Code 1895, § 3796, declares that expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them. See remarks of Bleckley, J., in Tift v. Towns, 63 Ga. [237] 242; Traders Ins. Co. v. Mann, 118 Ga. 381, 45 S.E. 426; Georgia R. & Banking Co. v. Gardner, 118 Ga. 723, 726, 45 S.E. 600. The recovery of this character of damages presupposes a right on the part of the plaintiff to bring the action, and deals with the question of the measure of damages recoverable. If the defendant in this case is seeking to recover for malicious use of legal process, commonly called malicious prosecution of a civil action, there are three essential elements in such a case: (1) malice; (2) want of probable cause; and (3) that the proceeding complained of had terminated in favor of the defendant before the suit for damages based upon it was brought. Brantley v. Rhodes-Haverty Furniture Co., 131 Ga. 276, 62 S.E. 222. There is no law by which every case brought by a plaintiff can be turned into a damage suit by the defendant against the plaintiff for bringing it, while it is still pending."

■ The defendant contends that the indemnity agreement sued upon is contrary to public policy, pointing out that the plaintiff in this case settled

the Applewhite suit against it without notifying the defendant of the pendency of that suit and without affording him any opportunity to defend the same or to have a voice in its settlement. The plaintiff, on the other hand, contends that the indemnity agreement is perfectly legal, does not contravene public policy and should be construed broadly enough to protect plaintiff so long as plaintiff acts in good faith even were it to settle without consultation with an indemnitor like defendant a case in which the indemnitor had not breached the bond. In invoking such broad interpretation plaintiff relies upon the additional language in the bond application whereby the indemnitor agrees: "that any proper evidence of the payment by the Company of any such losses, damages, costs, charges or expenses shall be conclusive evidence against me, my heirs, executors, and administrators, of the fact and extent of my liability to the Company under this agreement." This Court concludes that the indemnity agreement, when properly interpreted, is not at all against public policy, but that it is not necessary in this case, whether or not it would be permissible in any case, to interpret it as broadly as plaintiff desires. Were it to appear in this case that there was in fact and in law no breach by defendant of his bond a serious question would arise as to whether the plaintiff would be entitled to recover anything in this case. This question was answered in favor of an indemnitor in the case of Massachusetts Bonding & Ins. Co. v. Darby, D.C. W.D.Mo., 59 F.Supp. 175, 178, where the Court said:

"Why is that question [whether the bond had been breached] material to this controversy? The present action is based upon the quoted indemnity clause in defendant's application to plaintiff for the bond which purportedly guarantees the repayment to plaintiff of money paid by plaintiff—'for or by reason or in consequence of said Company having entered into or executed said bond.' Thus the present parties have changed their relative positions for plaintiff was formerly surety for defendant on his bond to the City and now defendant is in the position of a surety or guarantor to plaintiff by reason of the indemnity agreement sued on. Under those circumstances the indemnity agreement will be strictly construed in favor of defendant, Missouri, K. & T. R. Co. v. American Surety Co., 291 Mo. 92, 236 S.W. 657, and defendant will not be liable to plaintiff for voluntary payments made by the latter to the City in the compromise settlement between plaintiff and the City, to which defendant was apparently not a party. And that payment was voluntary or not dependent on whether there was a legal responsibility for the payment. The question of whether the City actually suffered a loss by reason of the alleged transactions becomes material therefore in determining whether plaintiff's compromise settlement was a voluntary payment."

This Court concludes both factually and legally, however, that the defendant did breach his bond by restraining Applewhite illegally and for an unreasonably long time. He restrained him three times, from August 11, 1950 until August 31, 1950, from February 28, 1951 until March 15, 1951, and again from March 14, 1951 (probably March 15, 1951) until March 23, 1951. The first two periods of restraint were illegal. Defendant incarcerated Applewhite on August 11, 1950 and kept him in jail until August 31, 1950 and certainly had no warrant of any kind prior to perhaps August 20, 1950, at the earliest, because the Tennessee warrant was air mailed from Tennessee on August 19, 1950, according to the telegram above quoted. It does not appear definitely that he ever received the warrant, but certainly he could not have received it before August 20th, some ten days after he had incarcerated Applewhite. Even if this Tennessee warrant, addressed

only to lawful officers of Hamilton County, Tennessee, would authorize the defendant, the Sheriff of Colquitt County, Georgia, to incarcerate a person thereunder, a point which is not necessary to be decided here, its receipt on August 20th would not have validated the prior illegal incarceration, nor would it have authorized incarceration for eleven more days without doing what the warrant commanded; namely, bringing him "before me or some other Judge of the Court of General Sessions of Hamilton County, Tennessee (or some other committing magistrate) to answer the above charge." Georgia Code § 27–212 reads as follows:

"Duty of person arresting without warrant.—In every case of an arrest without warrant, the person arresting shall, without delay, convey the offender before the most convenient officer authorized to receive an affidavit and issue a warrant. No such imprisonment shall be legal beyond a reasonable time allowed for this purpose."

What is a reasonable time is a question of fact and will vary according to circumstances, however, of significance here is the amended section as contained in the Georgia Laws of 1956, page 797:

"In every case of an arrest without a warrant the person arresting shall without delay convey the offender before the most convenient officer authorized to receive an affidavit and issue a warrant. No such imprisonment shall be legal beyond a reasonable time allowed for this purpose and any person who is not conveyed before such officer within 48 hours shall be released."

Moreover, Georgia Code, § 44–304, in force as of the time of this imprisonment and dealing with the disposition of fugitives when they are not demanded by the foreign state, authorizes detention under the Georgia Governor's warrant for as long as twenty days and concludes with this clause: "but upon affidavit made before any proper officer of the commission of the offense, and of such intended application, the accused shall be held under it *five days*." (Emphasis supplied.) Apposite here is the holding in Lavina v. State of Georgia, 63 Ga. 513, as follows:

"While section 56 of our Code, by construction and implication, may possibly authorize arrest of a fugitive from justice without warrant, yet the person so acting must, as soon as he can, without unnecessary delay, take the alleged fugitive before a magistrate in such case, as in all other arrests without warrant, and if not done in a reasonable time, the imprisonment is illegal, under section 4725 of our Code, already cited. So that the court was right in charging the jury to that effect. Harris v. City of Atlanta, et al., [62 Ga. 290] February term, 1879."

Then too, "imprisonment or detention beyond the reasonable time not only renders the imprisonment or detention illegal, but makes the entire transaction (including the arrest) a trespass ab initio." Piedmont Hotel Co. v. Henderson, 9 Ga.App. 672(6), 72 S.E. 51.

The second period of incarceration from February 28, 1951 to March 15, 1951, was likewise illegal, but the Applewhite suit complained only of the first period of incarceration and we are not concerned, therefore, with the second and third periods. Of course, the illegality of Applewhite's incarcerations is the very point which was decided by the Judge of the City Court in the habeas corpus proceedings in Sanders v. Paschal, 186 Ga. 837(1), 199 S.E. 153; Georgia Code, § 50–101.

In a case, therefore, like this one where the indemnitor has breached his bond and where the surety company is named defendant in a suit in which it is legally liable by reason of such breach there is no point of public policy which should prevent the enforcement of this type indemnity agreement. They are regularly enforced by the courts. American Surety Co. v. Davis, 43 Ga.App. 145, 157 S.E. 912; Whipple v. American

Surety Co. of N. Y., 5 Cir., 92 F.2d 673; Williams & Company v. United States Fidelity & Guaranty Company, 11 Ga. App. 635, 75 S.E. 1067.

■ The plaintiff acted in good faith in settling the $10,000 damage suit for $3,000 and its attorneys fees in that case of $504.63 were reasonable and proper. The plaintiff was liable to Applewhite in at least as much as $3,000. Of course, the good faith of the defendant in illegally imprisoning a person constitutes no excuse. Vlass v. Mc-Crary, 60 Ga.App. 744(2), 5 S.E.2d 63.

■ The defendant makes the point that at the time Applewhite sued the plaintiff Applewhite could not have then sued the defendant because of the expiration of the two-year period provided by the statute of limitations. This is unavailing in view of the fact that the suit was upon the bond and the applicable statutory period is twenty years. Slaton v. Morrison, 144 Ga. 471(2), 87 S.E. 390; Harris v. Black, 143 Ga. 497 (5), 85 S.E. 742.

■ The foregoing decides all questions save one: Is the plaintiff entitled to recover its attorneys fees of $1,168.21 for the prosecution of this action? This Court thinks not. The only authority cited by plaintiff which seems to support its contention on this point is Morrison v. Fidelity & Deposit Co. of Maryland, 150 Ga. 54, 102 S.E. 354. The Morrison case is only a headnote case and therefore does not afford as full a factual picture as could be desired. The headnote reads as follows:

"An agreement by a principal with his surety that the former will 'indemnify, and keep indemnified, the said company from and against any and all loss, costs, charges, suits, damages, counsel fees, and expenses of whatever kind or nature which said company shall or may for any cause, at any time, sustain or incur, or be put to, for or by reason or inconsequence of said company having entered into or executed said bond,' will authorize the company to recover reasonable attorney's fees incurred for prosecuting a suit for reimbursement of money paid out by the surety on account of the principal's breach of his bond. A contract of the character just indicated does not fall within the operation of the Civil Code, § 4252, relative to the giving of ten days notice. Oliver Typewriter Co. v. Fielder, 7 Ga.App. 525 (67 S.E. 210)."

There is some question as to whether the Court in the Morrison case really meant to say that the language therein quoted from an indemnity agreement would authorize the indemnitee to recover attorneys fees incurred for prosecuting a suit for reimbursement of money paid out by the surety on account of the principal's breach of his bond or had in mind merely a recovery of attorneys fees paid out in defending a suit on the bond. As above indicated, the factual situation is, of course, not fully reported in the Morrison case. At any rate, Justice Atkinson, who wrote the opinion in the Morrison case, distinguished it later in Smith v. Bukofzer, 180 Ga. 209, 178 S.E. 641, 642, as follows:

"The case differs on its facts from Morrison v. Fidelity & Deposit Co., 150 Ga. 54(4), 102 S.E. 354, and similar cases in which the covenant to pay attorney's fees was not for attorney's fees *for collection of the debt in question,* but as an item of expense incurred by the promisee in collateral matters." (Emphasis supplied.)

The only authority cited in headnote 4 of the Morrison case is Oliver Typewriter Co. v. Fielder, 7 Ga.App. 525, 67 S.E. 210, which does not support the proposition that if an indemnitee sues for attorneys fees for maintaining against the indemnitor a suit on the indemnity agreement he is not required to give the ten days notice as required by Civil Code, § 4252, § 20–506, Code of 1933. On the contrary, the Oliver Typewriter Company case says, 7 Ga. App. on page 527, 67 S.E. on page 211:

"It is conceivable that Fielder & Allen, in making their separate and independent contract with the typewriter company, might have provided that in the event it was necessary to sue them for the purpose of collecting the indebtedness which their contract with the typewriter company contemplated, they would pay, in addition to the amount of liability initially arising, attorney's fees for the collection of that sum out of themselves, and might have provided that this indebtedness should bear interest from the time it was ascertained, at say 7 or 8 per cent, per annum. In that event, in order to hold them to the payment of the attorney's fees, it would have been necessary for the plaintiff to pursue the terms of the statute; but they did not so promise, and there is no effort here to subject them to the payment of attorney's fees for collecting the indebtedness which they assumed under their obligation, and which became liable and owing by reason of what happened in connection with the principal indebtedness between the corporation and the typewriter company."

Under the above quoted language it would seem that if the indemnity agreement be so interpreted as to authorize recovery of attorneys fees for maintaining the suit thereon the notice for attorneys fees would have to be given. See in this connection, Sheppard v. Daniel Miller Company, 7 Ga.App. 760(4), 68 S.E. 451.

As this Court sees it, the $1,168.21 sought to be recovered by plaintiff for maintaining the present action does not constitute losses, damages, costs, charges or expenses arising directly "in consequence of the said bond." On the contrary, this expense arises directly in consequence of the defendant's breach of the indemnity agreement. The reasoning of Maryland Casualty Co. v. Sammons, 63 Ga.App. 323(2), 11 S.E.2d 89 and Milwaukee Mechanics Ins. Co. v.

Davis, 5 Cir., 198 F.2d 441(2), in factual situations somewhat different, support the view just expressed.

Moreover, the language of the indemnity agreement involved in the Morrison case is considerably broader than the language involved in the indemnity agreement involved in the instant case. The sweeping language "suits * * * counsel fees * * * of whatever kind or nature which said company shall or may for any cause, at any time" appears in the agreement in the Morrison case and is absent in the agreement involved here. In the opinion of this Court, the parties to this indemnity agreement never contemplated that the indemnitor was making himself responsible for attorneys fees for suing on said agreement.

This Court questions whether the lawyers of this State have generally construed these agreements so broadly as is contended for by the plaintiff in this case. In the case of American Surety Company v. Davis, above cited, the language of the indemnity agreement was broader than the language here relied upon, even as broad as the language in the Morrison case and yet the surety company there sued only for the attorneys fees and expenses involved in the collateral matters and not for the attorneys fees for maintaining that suit on the indemnity agreement. In the Whipple v. American Surety Company of New York case, supra, the opinion of the Fifth Circuit Court of Appeals does not disclose what specific items were sought to be recovered, merely stating "the surety paid the judgment and sued Whipple on his contract to indemnify". An examination of the record in that case in this Court, however, discloses that the surety sued for only the amount of the judgment in the prior litigation, plus interest thereon, attorneys fees and other lawful costs expended by the plaintiff in the defense of the prior litigation. Also, in the case of Williams and Company v. U. S. Fidelity & Guaranty Company, 11 Ga.App. 635, 75 S.E. 1067 the surety sued the principals to recover

only the amount of the judgment which had been obtained against the surety in prior litigation, together with certain sums paid by the surety for attorneys fees, costs and other expenses in connection with the prior and collateral litigation.

Counsel for the plaintiff may prepare and submit an appropriate order sustaining plaintiff's motion to dismiss defendant's counterclaim and a finding and judgment for the plaintiff in accordance herewith, submitting the same to counsel for defendant, who shall have five days thereafter for suggestions as to form.